Jane 8 LLC v Rosenblum (2025 NY Slip Op 51612(U))

[*1]

Jane 8 LLC v Rosenblum

2025 NY Slip Op 51612(U)

Decided on October 10, 2025

Civil Court Of The City Of New York, New York County

Malik, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on October 10, 2025
Civil Court of the City of New York, New York County

Jane 8 LLC, Petitioner,

against
Kenneth Rosenblum, DENISE ROSENBLUM, LARRY ROSENBLUM, 
 and "XYZ CORP.," Respondents.

Index No. LT-311237-23/NY 

Attorney for Petitioner
Doreen Fischman, Esq.
Fischman & Fischman
2166 Broadway #6D
New York, New York 10024
Tel. (212) 274-0555
[email protected]
Attorney for Respondents
Morris K. Mitrani, Esq.
Morris K. Mitrani, P.C.
271 North Avenue, Suite 901
New Rochelle, New York 10801
Tel. (212) 661-5100
[email protected]

Rena Malik, J.

On June 5, 2023, petitioner commenced the instant holdover summary proceeding against respondents seeking to recover possession of the commercial premises located in a portion of the ground floor (subject premises) in the building known as 25 Thompson Street (subject building or property) in Manhattan, New York. Issued was joined on July 14, 2023. 
Petitioner moved for summary judgment on its petition and to strike respondents' defenses. By decision and order dated January 16, 2024 the Court (Marcus, J.) granted the motion to the extent of finding petitioner established its prima facie case and dismissed respondents' second affirmative defense; it otherwise denied the motion finding issues of fact regarding the legitimacy of respondent Kenneth Rosenblum's lease (see NYSCEF Doc No 32).
Trial proceedings were held before the undersigned over twelve days,[FN1]
during which time the Court received testimony from petitioner's representative Francisco Augspach and respondents Kenneth Rosenblum and Lawrence Rosenblum.
I. Findings of Fact
A. Partition Action Background
In 2015, respondent Kenneth Rosenblum commenced an action for the partition of properties owned with his mother and former business partner Bernice Rosenblum in Supreme Court, New York County (index no. 654177/2015 [hereinafter the partition action]). Bernice passed away during the litigation and her estate was substituted as the defendant.
Pursuant to a trial decision and order dated January 4, 2022, the court (Crane, J.) found that the subject property was owned by Kenneth and Bernice as tenants in common (NYSCEF Doc No 41, exhibit B, trial decision and order dated 1/4/2022 at 3). By subsequent interlocutory order and judgment dated July 5, 2022, the court directed that the subject property, among other properties at issue in the litigation, be sold at an auction and appointed Hon. Anthony J. Carpinello (Ret.) as a Referee to conduct the sale (NYSCEF Doc No 42, exhibit 2 [hereinafter IO&J]). The interlocutory order provided in relevant part as follows:
Plaintiff and Defendants, and their respective counsel, shall cooperate fully with the Referee in the sale of the Properties and execution of any documents required by the Referee. The parties and their counsel shall also cooperate, prior to the auctions and thereafter as necessary, in the provision of appropriate financial and leasing information relating to the Properties.
* * *
The Referee shall conduct said sale according to the terms set forth in this Interlocutory Judgment, Article 9 of the RPAPL, the Terms of Sale, incorporated herein by reference as if set forth here in full and annexed hereto as Schedule A, and such other terms not inconsistent herewith, as the Referee deems appropriate.

 * * *
The purchaser shall take each Property in "as is, where is" condition, subject to the conditions more fully provided for in the Terms of Sale annexed hereto as Schedule A, and in the final judgment.

 * * *
Upon delivery of the Referee's deed, the purchaser shall be let into possession, and each party upon whom this judgment is binding, who may be in possession of the Property, is [*2]hereby directed to deliver possession of the same to the purchaser on production of the Referee's deed and each party to this action is hereby required, on demand of the purchaser of the Property, to deliver to such purchaser all titles, deeds or writings under the control of such party that relate wholly to the Property. The parties shall also cooperate with the Referee in delivering, to the Purchaser upon closing or within a reasonable time thereafter, copies of leasing and other relevant documents that relate wholly to the Property.
Until the delivery of the Referee's deed to the purchaser, (a) none of the parties herein shall enter into, modify or terminate any lease, license agreement or other agreement or encumbrance of any kind that would bind or otherwise affect the purchaser of the Property, without the written approval of the Referee, and (b) the parties herein shall continue to manage, operate and insure the Property in the ordinary course, consistent with past practice.
(exhibit B at ¶¶ 13, 15, 20, 23, 24). The Terms of Sale referenced in the interlocutory order state, in relevant part:
The Property is sold "AS IS" as of the date of the sale, without any representations either express or implied.
The sale will be subject to: * * *
(b) All covenants, restrictions, easements, declarations, rights of way, agreements, and reservations, if any, of record, and to any and all violations thereof;

 * * *
(e) Rights of tenants or persons in possession, if any;

 * * *
The Referee and the current owners of the Properties have not made and do not make any representations as to the physical condition, rents, leases, expenses, operation, or any other matter or thing affecting or relating to the premises, except as herein specifically set forth, and the Purchaser hereby expressly acknowledges that no representations have been made.
The Referee and the current owners of the Properties shall not be liable nor bound by any verbal or written statements, representations, promises, statements or guaranties, real estate broker's "setups" or information pertaining to any of the Properties furnished by any real estate broker, agent, employee, or any other person. The Referee and the current owners of the Properties are NOT LIABLE FOR ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTIES, PROMISES OR STATEMENTS OF ANY KIND RELATING IN ANY MANNER OF ANY OF THE PROPERTIES.
(NYSCEF Doc No 43, exhibit D at ¶¶ 13—16).
The premises were auctioned for sale on December 7, 2022 and Lauenen LLC was the prevailing bidder and purchased the property (tr 5/30/2024 at 25:25—26:1; tr 1/10/2025 at 18:24—19:2; 20:12—15; 23:1; 24:5—8). The Referee executed the deed to Lauenen LLC at closing on March 7, 2023, which was recorded on March 22, 2023 (NYSCEF Doc No 15, exhibit 6; tr 1 at 31:11-13). Lauenen LLC as owner net leased the building to petitioner (NYSCEF Doc No 1, petition).
B. Facts and Circumstances Then-Known to Petitioner Pre-Auction
Augspach testified he is a manager and general counsel to petitioner, and that he was the closing attorney for Lauenen LLC and represented it at the auction regarding this property and others (tr 5/30/2024 at 10:13—15; 18:18-22; 25:25—26:4). His company was considering bidding on three buildings, one of which included the subject building.[FN2]

Q: And with respect to those three buildings, did you review any documents prior to the auction?
A: The same as for 25 Thompson which means the offering memorandum, the short title search run — the offering, memorandum, the small title search which was submitted, the documents of the record, and I believe I also did on a research on the HPD website of the agency and AKRIS [sic] which the records and the data room which is what Mr. Mitrani mentioned the brokers hosting the sale JLL had uploaded all the documents for the public to view which included the offering memorandum, the contract and the terms of the sale. I forget — perhaps the DHCR the registration for regulated rent might have been there. I don't remember if it were there. Maybe I saw it afterwards.
(tr 10 at 45:2-20).
None of the foregoing due diligence, including the title search and title report, revealed any suggestion of a lease for the subject premises (see tr 10 at 46:3-6; tr 10 at 9-10). Rather, the offering memorandum stated that the subject premises was vacant (tr 5/30/2024 at 15:11—17; NYSCEF Doc No 40 at 9, excerpt of RB/JLL Brokerage marketing brochure).
Augspach acknowledged that the full marketing brochure referenced a data room, which he also personally reviewed (tr 2 at 18:15-19). The data room was accessible via the broker's website, where a prospective purchaser could download and view many files related to the property (see tr 7 at 38:4-11). In the data room, there was an addendum to the brochure, which, in the line referencing the subject commercial space, stated in a "notes" section: "Currently occupied by family member who is in litigation to be removed" (tr 2 at 19; NYSCEF Doc No 53). Augspach does not recall seeing this addendum. Specifically, he testified: "My recollection is when I went to the data room to find the information about the auction, this was not there. At least I don't remember seeing this, let's put it that way" (tr 2 at 20:10-12).
The record is unclear as to when Augspach reviewed the data room and could have seen the addendum. Lawrence testified that he first saw the brochure in the summer of 2023 (tr 7 at 38:22-39:1) but there is no testimony as to when this addendum, specifically, was uploaded to the data room. Because the motion seeking Kenneth's surrender and vacatur of the premises was made in October 2022 in the partition action, the Court finds that it is highly unlikely that the "note" or comment about his occupancy being litigated could have existed before then.
In any event, Augspach reviewed the NYSCEF docket in the partition action a few days before the auction, possibly December 1, 2022 (tr 10 at 28; tr 2 at 22:23-23:2), at which time he could have, conceivably, noticed some motion practice related to Kenneth's occupancy of the premises (see tr 29-30). However, Augspach credibly testified that he did not review every [*3]single entry in the partition action because he did not see a reason to do so (tr 10 at 49-50). In his experience, having been a title officer, he is used to reviewing litigation files related to auctions and the orders from the litigation matters that mandate the sale (tr 10 at 50):
THE WITNESS: To be sure, it is usually more than one order. This is always one partition ordering the partition by sale, the portion by sale [sic], and there is another order appointing the referee, and sometimes the other order appointing the attorneys or the brokers or the particulars.
Q: And are those the documents that you reviewed before you appeared at the auction?
A: Yes.
(tr 10 at 50:22-51:4). There was no fact of a lease in anything he reviewed — whether in the data room or any document from partition action, nor anything "hinting of it" (tr 10 at 53-54).
Augspach also conducted a visual inspection of the property prior to purchasing and observed as follows with respect to the premises: "The roll up was down. I could see through the glass, it looked like a very dated office equipment. It seemed to me it had not been open perhaps for years. Not that I specifically investigated but that's what I got the impression" (tr 2 at 33:12—15). He also Googled the property and found nothing relevant (tr 1 at 19:10—18).
Augspach knew that the property would be sold "as is" — which is standard practice — and that it would be sold subject to the rights of tenants in possession (tr 2 at 34-35).
C. The Respondents' Use of the Premises
While Augspach believed the premises looked abandoned or vacant, Kenneth and Lawrence testified otherwise.
Kenneth and his mother had an office together at 117 Waverly Place in Manhattan to conduct their business (tr 3 at 8). His mother became elderly, senile, and it became impossible for him to work in the office, as she would yell and call him and other employees all sorts of names (tr 3 at 8-9). He relocated office space to the subject premises at 25 Thompson Street in around 2014 (tr 3 at 9-10) and would occasionally go back to the Waverly Place office to operate the business (tr 7 at 79). Both his son Lawrence and his wife Denise also used the premises as an office as well for their own separate real estate businesses (tr 3 at 23-24). Lawrence similarly testified that he also occupied the space for his own commercial real estate and/or mortgage business (tr 7 at 28-30).
It is unclear when respondents, or at least Kenneth, started using the premises, exclusively, as the only office to conduct business. Lawrence stated it was within the "ensuing months" after first relocating to the premises but it could have been at any time between 2015 and 2019, which is when the Waverly Place office closed (tr 7 at 80—81). Lawrence claimed that his father was using the premises on "most working days" prior to the sale in 2022 (tr 8 at 46) and then once every few days since the sale (tr 7 at 134).
Kenneth testified that one or two brokers from JLL had come to the building to inspect/view the property two or three days per week from the time the IO&J was issued in July and marketing of the properties began until the auction in December of 2022 (tr 3 at 29). And he stated that one or two prospective purchasers entered the premises and saw him working there (tr 3 at 29:21-30:2).
On the days of the auction, Lawrence testified that he would go to the subject premises during the lunch breaks. Lawrence testified that he was in the office with his mom and dad (tr 7 [*4]at 52) and then testified that he does not remember who else was there other than his father (tr 8 at 41). Lawrence claimed that two representatives from Lauenen LLC came to take another look at the building and walked around the block taking pictures (tr 7 at 51-52). Lawrence assumed they saw him because he exchanged eye contact with them; they acknowledged each other's presence (tr 7 at 52-53). However, Augspach credibly testified that he was the sole representative from Lauenen LLC attending the auction, along with two of his own personally-hired brokers, and that they never went to the property during the breaks on the auction days (tr 10 at 3—4; see also tr 10 at 47—48 [Augspach testifying as to what he did on the break on the second day]). The Court credits Augspach's testimony over Lawrence's given other portions of Lawrence's testimony that the Court finds not worthy of credit, as described infra, and in light of Lawrence's contradictory statements and/or general evasiveness in answering questions on cross-examination (see, e.g., tr 9 at 17-18). On this topic, Lawrence clearly testified on direct that he "made eye contact with the two representatives from Lauenen" (tr 7 at 53), but then on cross examination, claimed to not have said that and/or did not know who "the purchasers" were even though he had previously testified about the purchaser by its specific name (tr 8 at 41). Rather, the Court finds that the only interaction that the parties had was being physically present at the auction over two days; and Augspach never spoke to any of the respondents before, during, or after the auction (tr 10 at 8:1-11; tr 6 at 47:14-23).
D. Facts and Circumstances Then-Known to Petitioner post-Auction
After signing the contract and prior to closing, Augspach spoke with the property manager, and received and reviewed rent records and ledgers, leases, violations, building permits, and building contracts for the property (tr 1 at 26:11-18; tr 10 at 5; tr 10 at 14:21-15:6). He never received a lease or occupancy agreement for the subject premises, nor any documentation about it, including any document evidencing rent paid (tr 1 at 26:19-7; 31:14-17; tr 2 at 4:20-24; tr 10 at 5; tr 10 at 14:21-15:6). He received leases and other documentation for the other units that were not marked as vacant — all residential units as well as the only other commercial unit in the building that was known to have a lease (tr 1 at 27:8-19; 31:22-32:2; tr 10 at 14-15).
The closing was held on March 7, 2023. On the morning of the closing, Augspach conducted a walkthrough of the building with superintendent (tr 10 at 6). At that time, he again observed the premises having an iron rollup gate covering premises and could see outdated furniture inside through window (tr 10 at 7). Augspach believed the premises were abandoned (tr 10 at 36:6-16).
After closing, Augspach still had not received any document indicating a tenancy existed for the subject premises (tr 1 at 31:18-21) nor of any rent being paid (tr 2 at 4:25-5:4).
There was a rent reconciliation to determine rent profits owed to the seller and to the buyer during the month of March 2023 (tr 1 at 38—40). The buyer's and sellers' attorneys worked on the rent conciliation extensively and it resulted in a rent conciliation table or chart, which represented the final agreement between the new owner and the attorneys' representing Kenneth and his mother's estate (tr at 39:19-25; NYSCEF Doc No 49, exhibit 3). The table listed every apartment and included information on only one of the two commercial units — the cleaners, which had a lease (see exhibit 3). Augspach testified that the parties spent a lot of time on the adjustments for the units (tr 10 at 5) and during such extensive discussions, "[a]t no point did the attorney for Mr. Rosenblum offer any rent or anything or made any comment about it being [*5]occupied or executed a deposit for Mr. Rosenblum" (tr 1 at 38:22-25; see tr 1 at 43 ["there was no claim that of anyone in occupancy or paying rent or offering security deposit"]).
E. Facts Leading to the Lease's Revelation
Neither the superintendent nor the management office had keys to premises (tr 1 at 44:12-13; tr 10 at 39:18-40:4). The superintendent was therefore directed to change the locks (tr 10 at 16-17).
Augspach claims to have first learned of any occupancy on the day petitioner sought to change the locks (tr 10 at 8:17-9:2). Augspach personally was not there but it was his understanding that the superintendent along with petitioner's agent Harvard Iversen were about to change the locks when two respondents, Lawrence and Denise Rosenblum, appeared across the street and the superintendent recognized them. The police were called and Augspach told the police through his agent that petitioner owns the property and they were taking possession of the space that was vacant. The police allegedly spoke with respondents and respondents allegedly claimed they had a lease and were paying rent; the police advised that they could not let petitioner break the locks (tr 1 at 44-45; tr 10 at 8:17-9:2).
Kenneth testified that he does not remember if he was there that day (tr 3 at 24-25).
Lawrence stated that he was there and his testimony was not significantly different from Augspach's: Lawrence testified that he received a call from the superintendent saying that management asked him to change the locks; he got there and called his dad; his dad said don't let them do it and Lawrence told them not to (tr 7 at 49-50; tr 9 at 4:10-25). He told the petitioner's agent that they have a lease so they cannot break the lock (tr 9 at 5:9-25). Lawrence then stated that his "father ended up coming, telling him the same thing" (tr 9 at 5:9-25), which this Court finds not credible given Kenneth does not recall whether he was there and Augspach credibly testified that his representative referred to only Lawrence and Denise Rosenblum as the respondents that were present. The Court further finds Lawrence's testimony not worthy of any credit as he stated, within one breath, "eventually I called the police. I called the police. I don't know if I did, but the police were called" (tr 9 at 5:9-25). The police came and told petitioner not to cut the locks (tr 7 at 50; tr 9 at 5). Lawrence does not recall speaking to police directly (tr 9 at 6) but does recall that the police wanted to know whether respondents had keys, and he did not know what was said in response (tr 9 at 7). He could not remember whether, after the encounter, he used keys and went into the premises (tr 9 at 6-7).
Petitioner then served a notice of termination dated April 19, 2023, which references certain affidavits in the Supreme Court partition action stating that Kenneth occupied the premises as an office as early as 2016, without a lease and having never paid rent (exhibit 4). It further advised that the petitioner hereby revokes any temporary license to occupy the premises and any right to possession (exhibit 4).
After commencing the instant holdover proceeding on June 5, 2023, respondents filed their answer on July 14, 2023, stating, as their third affirmative defense that "Respondents are lawfully in possession of the subject Premises pursuant to a valid lease for a term of years" (NYSCEF Doc No 6). It appears from the record (of which the Court takes judicial notice) that the lease was first produced to petitioner's counsel sometime between August—September 2023, before petitioner made its summary judgment motion (see NYSCEF Doc No 8, parties' stipulation to adjourn appearance in Part 52 and providing that respondents will provide a copy of the lease by 8/23/2023; NYSCEF Doc No 13, Fischman aff at ¶ 16 [noting the lease was [*6]produced after this proceeding began]). This appears to be the first time anyone has ever seen a lease for the subject premises, aside from respondents.
Kenneth testified that he prepared and executed a lease to himself on March 15, 2020 (tr 3 at 30:17-18). The lease is for a term of twenty-two (22) years at $100.00 per month (tr 3 at 15-16; NYSCEF Doc No 22, exhibit C). He claimed that, after the trial concluded in the partition action, he knew the jointly owned properties would be sold at auction and he needed "to protect [himself]" to ensure he had an office (tr 3 at 21; tr 4 at 19). However, since the lease was executed, no rent had ever been paid — either to himself or the managing agent appointed in the partition action, or the new owner or petitioner (tr 3 at 19; tr 2 at 65:21-23). The lease rider provides that payment of rent "shall start upon presentation of a rent bill directly into the hand of tenant" (exhibit C at 7, ¶ 12) and Kenneth has never received a rent bill from himself or anyone else (tr 5 at 61). Indeed, Kenneth never really intended to pay rent to himself, or to his mother/mother's estate as co-owner (tr 6 at 25-27). It was common practice within the family to occupy spaces owned by the family without ever paying rent (see tr at 63). As Judge Crane noted in a decision and order dated November 14, 2022 in the partition action, "Kenneth's and Lawrence's occupancy is consistent with the course of dealing between the parties whereby both sides allowed family members, especially children, to live in jointly owned properties rent-free for years and years" (NYSCEF Doc No 50, exhibit F).
Kenneth testified that no one else witnessed him executing the document (tr 3 at 47) and the lease was never recorded (tr 3 at 20).
Lawrence testified on direct examination that he assisted his father in creating the lease on certain clauses to include: "My father wrote up his own leases so he was, you know, back and forth, you know, to this, what should I put and we went back and forth on the different clauses I guess and what not" (tr 7 at 33; tr 8 at 4:25-5:6 ["My father would ask me questions of how to do, it, what to write"]). His father took it from a form and included his amendments (tr 8 at 6:14-20). However, on cross-examination, Lawrence stated that his participation was to "print stuff" and "put" things "together because his father is "not so tech savvy" (TR 8 at 15:16-22), and insinuated that he did not help draft provisions in the lease, nor was knowledgeable about the same:
Q: Mr. Rosenblum, how did it come about that you became knowledgeable of this purported lease at 25 Thompson Street?
A: It began — I told you the last time — when he asked me to print it, help him logistically. That is when I first came to know it.
Q: When you were assisting him at that time, you were knowledgeable of the provisions set forth in that lease; is that correct?
A: No.
Q: I'm sorry. I don't understand. Did you or did you not assist your father in the drafting of that lease?
A: In the drafting of picking which things to put in, he took care of most of it. He needed help printing it, organizing it. I didn't read it with a fine tooth comb . . . .

 * * *
Q: Did you not help him draft any of the provisions in the lease?
A: I don't remember.
(tr 9 at 15:7-25).
The lease was not given or delivered to anyone after its execution — not the managing agent (tr 3 at 65-66, 70; tr 4 at 42:16-21; tr 5 at 29-30; tr 4 at 49), Kenneth's mother or her attorneys (tr 3 at 67; tr 4 at 21; tr 5 at 29-30), the Referee appointed in the partition action (tr 2 at 70; tr 4 at 49; tr 5 at 29-30), to the purchaser or its attorneys (tr 3 at 70-71; (tr 4 at 48); or his counsel in the partition action (tr 4 at 53; tr 5 at 29-30). At the time of the auction, no one had a copy of the lease except Kenneth himself (tr 4 at 42:12-15) and he admits that the new owner of the property never had a copy of the lease prior to the commencement of this proceeding (tr 4 at 50). Unequivocally, Kenneth testified: "I never. I did not give a copy of that lease to anyone. Kept it on my desk" (tr 5 at 30: 3-4).
With the exception of, maybe, his family (tr 4 at 52:23-53:4), no one was orally advised about the lease or had knowledge of its existence (see tr 4 at 20 [managing agent]; tr 4 at 37 [potential purchaser(s) at auction]; tr 4 at 53 [does not recall if he told his counsel in partition action]; tr 6 at 43-44 [does not know if counsel in the partition action knew about it or not]; but see tr 6 at 64-65 [also says his attorneys knew he had a sweetheart lease]).
II. Discussion
The Court was presented with two issues at trial: (1) whether a valid lease exists; and (2) assuming the lease is valid, whether petitioner is entitled to the benefit of the recording statute as a bona fide purchaser for value.
Petitioner argues that the owner purchased the property for value, without any reservation of rights with respect to the subject premises; and petitioner had neither actual nor constructive knowledge of the lease, such that the lease cannot be enforceable against petitioner under the recording statute as a bona fide purchaser. Petitioner also contends that the lease was fraudulent, backdated and manufactured for litigation; and it is otherwise not valid as Kenneth was without authority to issue said lease, and it was never delivered nor ratified as no rent was ever paid.
Respondents argue that there was no restriction on Kenneth's authority to execute the lease before the IO&J was issued on July 5, 2022 and that it was not backdated — Kenneth explained the circumstances of why he prepared it to protect himself after the partition action would eventually end in a sale of the properties. Further, the fact that Kenneth did not pay rent and never intended to pay rent was common practice within the family and their occupancies of various buildings the family owned. Respondent claims the new owner was not a bona fide purchaser entitled to protection under the recording statute because it had constructive notice of sufficient facts that should have prompted an inquiry with respondents' possession and the lease.
A. Waiver of Rights & Collateral Estoppel
Initially, the Court rejects respondents' argument that petitioner is bound by a waiver of rights to object to Kenneth's occupancy from the decision and order in the partition action that denied the branch of the estate's motion for ejectment. Respondent cites 52 Riverside Realty Co. v Ebenhart (119 AD2d 452, 453 [1st Dept 1986]), which stated: "It is well recognized in this State that the transferee of real property takes the premises subject to the conditions as to tenancy, including any waiver of rights, that his predecessor has established if the transferee has notice of the existence of the leasehold." Here, notice of the existence of a leasehold is the heart of what is being decided in trial. If respondents meant that the transferee had notice of the existence of Kenneth's occupancy, that too is being decided here as petitioner claimed the [*7]premises appeared abandoned.
Respondents' collateral estoppel argument is also unavailing. The doctrine of collateral estoppel, also known as issue preclusion, "bars the relitigation of 'an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment'" (Paramount Pictures Corp. v Allianz Risk Transfer AG, 31 NY3d 64, 72 [2018], quoting New Hampshire v Maine, 532 US 742, 748-749 [2001]). Two requirements must be met to invoke the doctrine: "First, the identical issue necessarily must have been decided in the prior action and be decisive of the present action, and second, the party to be precluded from relitigating the issue must have had a full and fair opportunity to contest the prior determination" (Kaufman v Eli Lilly and Co., 65 NY2d 449, 455 [1985]). Clearly, the facts here fail to meet these requirements as, among other things, the issue of whether a valid lease existed was never raised in the partition action. Thus, petitioner is not collaterally estopped from challenging the existence of the purported lease, the same way that this Court previously held that "Respondents are not collaterally estopped from asserting that Mr. Rosenblum's lease exists as this issue was not before the Supreme Court, nor did the Supreme Court make a ruling on the issue" (NYSCEF Doc No 32 [Marcus, J.]; see id. at n 1 ["The Supreme Court did not rule on whether Mr. Rosenblum had a sweetheart lease for the subject premises"]).
The relevant orders in the partition action dealt with occupancy, which is distinctly different from a lease, as will be discussed infra, and the rent-free occupancy was only raised in relation to the equalization of the parties' capital accounts. As the motion regarding Kenneth's occupancy had only been raised after the trial, the Supreme Court in the partition action refused to consider it, finding that the estate should be precluded from raising such issue after the trial was held and a decision was rendered (see partition action NYSCEF Doc No 587, order dated 8/24/2022 [noting that such issue was never claimed in this case and should have been brought up at the trial, at the latest]; partition action NYSCEF Doc No 50, order dated 11/14/2022 at p 2 [to determine the amount of compensation, if any, would require an entirely new trial and it should have been raised at trial]).
The Court also rejects respondents' remaining argument that petitioner failed to show it has the proper status or privity to challenge the lease, which was never raised at trial and is without merit as petitioner was already granted summary judgment as to its prima facie case by decision and order dated January 16, 2024 (NYSCEF Doc No 32).
B. Petitioner's Status as a Bona Fide Purchaser
Real Property Law § 291 provides:
Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof, or acquires by assignment the rent to accrue therefrom as provided in section two hundred ninety-four-a of this article, in good faith and for a valuable consideration, from the same vendor or assignor, his distributees or devisees, and whose conveyance, contract or assignment is first duly recorded, and is void as against the lien upon the same real property or any portion thereof arising from payments made upon the execution of or pursuant to the terms of a contract with the same vendor, his distributees or devisees, if such contract is made in good faith and is first duly recorded.
Pursuant to Real Property Law § 290 (1), respondents' lease here is considered as a "conveyance of real property" subject to the recording statute as it exceeded a term of three years.
"The New York Recording Act, inter alia, protects a good faith purchaser for value from an unrecorded interest in a property, provided such a purchaser's interest is first to be duly recorded" (Yen-Te Hsueh Chen v Geranium Dev. Corp., 243 AD2d 708, 709 [2d Dept 1997] [internal citations omitted]).
"The status of good faith purchaser for value cannot be maintained by a purchaser with either notice or knowledge of a prior interest or equity in the property, or one with knowledge of facts that would lead a reasonably prudent purchaser to make inquiries concerning such" (id.; Royce v Rymkevitch, 29 AD2d 1029, 1030 [3d Dept 1968] [a party "could not claim the status of a bona fide purchaser" "if he had knowledge of facts that would lead a reasonably prudent purchaser to make inquiry and he failed to do so"] [internal quotations and citation omitted]). 
Based on the facts presented at trial, the Court finds that petitioner did not have actual knowledge of the lease at the time of purchase as it was never revealed until after commencement of this proceeding (cf. Sam & Mary Hous. Corp. v Jo/Sal Mkt. Corp., 121 Misc 2d 434, 439-40 [Sup Ct, Queens County 1983], affd as mod 100 AD2d 901 [2d Dept 1984], affd 64 NY2d 1107 [1985] [where purchaser's former attorney testified that purchaser knew about the 10-year lease; court found purchaser "generally unworthy of belief" as it was implausible to disregard the lease's existence or claim the tenancy was an oral month-to-month]; Amalfi, Inc. v 428 Co., Inc., 185 AD3d 1553, 1555-56 [4th Dept 2020]).
The issue here is whether petitioner had constructive notice, i.e., "knowledge of any fact, sufficient to put him on inquiry as to the existence of some right or title in conflict with that he is about to purchase" (Maiorano v Garson, 65 AD3d 1300, 1300-03 [2d Dept 2009], quoting Williamson v Brown, 15 NY 354, 362 [1957] [internal quotation marks omitted]). "If the facts within the knowledge of the purchaser are of such a nature, as, in reason, to put him upon inquiry, and to excite the suspicion of an ordinarily prudent person and he fails to make some investigation, he will be chargeable with that knowledge which a reasonable inquiry, as suggested by the facts, would have revealed" (Anderson v Blood, 152 NY 285, 293 [1897]). And such fact(s) that would have been revealed, charged against him, would defeat any claim "to be considered as a bona fide purchaser" (Maiorano v Garson, 65 AD3d 1300, 1300-03 [2d Dept 2009], quoting Williamson v Brown, 15 NY 354, 362 [1957] [internal quotation marks omitted]).
Here, there is nothing from the City Register record itself that would suggest an inquiry be made (see, e.g., Gustavia Home, LLC v Rutty, 16-CV-2823 (BMC), 2018 WL 2198742, at *5-6 [EDNY May 14, 2018], affd 785 Fed Appx 11 [2d Cir 2019]; cf. Fairmont Funding v Stefansky, 301 AD2d 562, 563-64 [2d Dept 2003] ["plaintiff's lien was recorded and indexed" "at the time of the contemplated purchase" putting purchaser on "constructive notice of the plaintiff's mortgage and was chargeable with the duty to make further inquiry to determine whether the lien had been satisfied or released"]; Tibby v Fletcher, 13 AD3d 877, 879 [3d Dept 2004] ["Had plaintiffs performed a title search prior to purchase, they would have discovered that which was revealed when the title search finally was performed—namely, the existence of the Department's lien against the property"]; Zucker Real Estate Corp. v Wilson, 2019 NY Slip Op 30932[U], *2-7 [Sup Ct, NY County 2019] [where Wilson's deed was inadvertently recorded under the wrong block and lot; however, his security/mortgage in favor of the then-owner of [*8]record was properly recorded, imposing a duty upon plaintiff to inquire as to whether the mortgage had been satisfied and/or that there may be a potentially adverse interest]).
Respondents point to their occupancy and possession of the premises as a fact that should have prompted an inquiry. Specifically, the Rosenblums claim they were using the space as an office and were physically present multiple days a week; there was motion practice in the partition action regarding their occupancy of the premises; and the data room had a comment about how the premises was occupied by the owner.
The possession which will be equivalent to actual notice to a subsequent purchaser, must be an actual, open and visible occupation, inconsistent with the title of the apparent owner by the record; not equivocal, occasional or for a special or temporary purpose; neither can it be consistent with the title of the apparent owner by the record.
(Holland v Brown, 140 NY 344, 347-48 [1893]).
Here, it is questionable whether the respondents' occupancy was "actual, open and visible." On one hand, there was no sign in front of the premises indicating it was being used by anyone; when Augspach visited the building at least twice, both times the iron roll gate was down and the premises appeared to have been abandoned; and the marketing brochure states that the premises were "vacant." On the other hand, Kenneth testified that respondents used the space since 2016 or 2018 as an office when his business relationship with his mother had soured; Kenneth's occupancy is noted in an addendum, found in the data room along with other relevant information for prospective purchasers; the affidavits in the partition action are consistent with the claimed occupancy; and the petitioner's notice of termination specifically referenced the affidavits, noting Kenneth's occupancy of the premises as an office. Balancing such evidence, the Court finds that the premises were not abandoned or vacant but that respondents had occupied the premises.
However, such finding may not be necessary to the ultimate determination, which relies on whether such possession was inconsistent "with the title of the apparent owner by the record" (see Tompkins County Trust Co. v Talandis, 261 AD2d 808, 810 [3d Dept 1999], quoting Holland, 140 NY at 347-48). 
For example, in Cooper v Pullar (145 AD3d 1247 [3d Dept 2016]), the plaintiffs-tenants argued the bank who provided a mortgage to a new purchaser had a duty to inquiry about their claimed interest in the property, which was under an unrecorded lease. The court held the bank had no such duty because "plaintiff's occupancy was wholly consistent with his rights as a tenant under the lease given that he continued to live at the property and paid monthly rent" (145 AD3d at 1248). Thus, there was nothing about plaintiffs' possession that would give notice of a conflicting interest. Additionally, in Fekishazy v Thomson (204 AD2d 959 [3d Dept 1994]), the Court found that a tenant's possession of a space, thought to be under an oral month-to-month tenancy could not have provided notice that the occupant actually had a lease, as both occupancies are consistent with each other, and not inconsistent with the title of the apparent owner of record (204 AD2d at 959-63).
There are instances where a record or title search, coupled with certain circumstances, such as a visual inspection or other investigation, may prompt a purchaser to make an inquiry based on a party's occupancy or possession because it had been inconsistent with the title of the apparent owner of record (see, e.g., HSBC Mortg. Services, Inc. v Alphonso, 58 AD3d 598, 598-600 [2d Dept 2009] ["at the time Point purchased the property at issue, the person in possession [*9]of the property was not the owner of record. Point, therefore, had a reasonable duty of inquiry to investigate the apparent discrepancy"]). For example, in Mazza v Realty Quest Brokerage Corp., (185 Misc 2d 162 [Civ Ct, Kings County 2000]), plaintiff-mortgagor claimed a lack of inquiry notice of defendant having a life estate in the premises. Plaintiff relied upon the appraisal company's visit to the property and alleges no one ever told or advised plaintiff that defendant had a life estate in the premises "or that she was anything more than a normal tenant" (185 Misc 2d at 166).
However, the information listed on page three in [the] appraisal report, on which plaintiff admits reliance, indicates otherwise. The report lists each unit of the premise, rent paid at the time of the appraisal and the estimated rents. The first unit occupant is listed as "owner" with "0" lease, and "0" rent paid. The second unit occupant is listed as "tenant" with "no lease" total rent "$775." In order for [the appraiser] to have listed the interest of the first unit as "owner" [the appraiser] had to have knowledge of some possessory interest in the premises by [the defendant] as that other than as tenant.
(id. at 166—167). Therefore, such fact known at the time of issuing the mortgage prompted a duty to inquire about the defendant's occupancy at the property, as it suggested defendant had an interest "other than as tenant" in the property that may be adverse to plaintiff's interest (see id.).
This matter does not have similar circumstances as presented in Mazza or HSBC. Here, the Rosenblums' occupancy of the premises, at some point from 2016 or 2018, through the auction and sale of the premises, up until closing, was not inconsistent with the record. Kenneth was an owner and he was using the space. As Auspatch stated, "It is not unusual for an owner to turn over the space previously occupied by an owner in closing" (tr 10 at 36). It appears the IO&J also contemplated the same: "Upon delivery of the Referee's deed, the purchaser shall be let into possession, and each party upon whom this judgment is binding, who may be in possession of the Property, is hereby directed to deliver possession of the same to the purchaser on production of the Referee's deed . . . " (exhibit B at ¶ 23 [emphasis added]).
Rather, this situation is akin to that found in Tompkins County Trust Co. v Talandis (261 AD2d 808 [3d Dept 1999]). In Tompkins County Trust Co., the issue before the Court was "whether plaintiff was without knowledge 'of facts that would lead a reasonably prudent purchaser to make inquiry' regarding defendant's occupancy of the [property], and whether defendant's occupancy and representations to plaintiff were inconsistent with [defendant's ex-spouse's] fee interest and thereby constituted actual notice of an adverse interest" (261 AD2d at 810). The Court held that there was no evidence in the record suggesting defendant had an interest in the property, based on her occupancy alone, that was adverse from the record. Even though defendant and her former spouse had agreed to give defendant a life estate in a separation agreement, which was incorporated into but not merged with, the judgment of divorce, the plaintiff did not know about it and there were otherwise no facts suggesting that defendant had a life estate in the property.
Although it is undisputed that plaintiff was aware of the Talandises' divorce and defendant's presence at the property, plaintiff denied that it had any knowledge of the terms of the divorce judgment or separation agreement. Further, the record in this case indicates that the financial statement submitted by [defendant's ex-spouse] to plaintiff did not indicate that he derived any rental income from defendant, implying that there was no written lease with defendant. Defendant's four judgments against [ex-spouse] evidenced [*10]his considerable indebtedness to defendant, but did not suggest a possessory interest in the real property.
(261 AD2d at 810—811).
Interestingly in that case, like the case sub judice, the defendant had multiple opportunities to tell plaintiff about her alleged possessory interest:
[D]efendant nevertheless failed to voice any possessory interest in the property during the course of negotiations and dealings to arrange the consolidated refinancing, which included several direct contacts between plaintiff and defendant prior to the loan closing. Earlier, in anticipation of the 1993 judgment of foreclosure sale, defendant searched for another residence and at some point, the property had been listed for sale for more than two years. Defendant's silence during the refinancing negotiations, while represented by counsel, and her further consent to the subordination of her four judgment liens against [her ex-spouse] belied her future assertion of an equitable or legal interest in the property superior to that of plaintiff.
(id. at 811).
The specific occupancy respondents allege here, as a commercial tenant with a lease, is inconsistent from that of an occupancy of an owner in possession — and it is that type of possession that must have been known or suggested to defeat petitioner's bona fide purchaser status. Here, the Court finds that there was no such fact or circumstance suggesting a tenancy with a lease for a term of years sufficient to prompt an inquiry as to the existence of a lease or tenancy with respect to respondents.
The Court finds that despite many opportunities to "voice" the alleged possessory interest in the premises as a tenant with a sweetheart lease, respondents sat in silence for years.
Although the lease was purportedly executed on March 15, 2020, there was no fact or suggestion of a lease at any time after the partition action trial concluded in March 2020, or after the trial decision and order was issued in January 2022.
There was still no fact or suggestion of a lease after the IO&J was issued along with the terms of sale in July 2022, and the issuance of the marketing brochure, which labeled the premises as vacant. 
There was still no fact or suggestion of a lease during the partition action, even when Kenneth's occupancy was specifically at issue in the fall of 2022.[FN3]
Kenneth's response as to why [*11]he did not disclose the lease at this point is that he felt like he had to keep his mouth shut because of all the litigation (tr 3 at 63). Such an answer might appear to be a reasonable explanation at first blush and/or standing alone, but the Court finds it as not worthy of credit given the multiple opportunities to disclose the lease before and after the post-trial motion practice as described herein.
There was still no fact or suggestion of a lease from auction on December 7, 2022 through closing on March 7, 2023. This being so even as the IO&J directed that the parties provide "leasing information," "titles, deeds or writings," and "copies of leasing" that wholly relate to the properties (exhibit B at ¶¶ 13, 23).
There was still no fact or suggestion of a lease for the premises during the rent conciliation that was extensively negotiated between the attorneys for the buyer and sellers during March of 2023, which was finalized after March 31, 2023.
The first time anyone had mentioned the existence of the lease was when petitioner went to change the locks and petitioner learned of a claimed interest. Then it was mentioned in respondents' answer filed July 14, 2023. The first time a copy of the lease was given to anyone in the world was sometime in August or September of 2023, only after this proceeding commenced. Thus, the Court finds that such evidence belies respondents' assertion of a legal interest that is superior to that of petitioner (see, e.g., Tompkins County Trust Co., 261 AD2d at 811). Indeed, Kenneth repeatedly testified that he believed he never had an obligation to tell anyone he had a lease, or give a copy of it to anyone (not the managing agent, referee, nor the purchaser, in contravention to the IO&J) — but the Court finds Kenneth was evasive and did not answer the question as to whether he had the opportunity to advise the purchaser or anyone else (tr 6 at 47).
Respondents argue that petitioner should have asked if there was a lease because Kenneth and the co-respondents were literally in possession. Kenneth testified multiple times that the purchaser should have asked him, "why are you here?" or "what are you doing here?" (tr 4 at 34, 50-51, 53). However, the Court finds it unreasonable to ask such a question when the premises were simply owner-occupied. In other words, the record owner was in possession of a commercial unit that had no known lease. Such occupancy was entirely consistent with the title of the apparent owner of record. Therefore, the facts and circumstances then-known at the time would not have "excite[d] the suspicion of an ordinarily prudent person" to prompt any inquiry into a lease that no one knew existed.
[A]nd if the evidence does not reveal that fact, how can we assume that investigation would have been useful? The question is not whether [the purchaser] Mrs. Blood could [*12]have discovered the existence of any fraud by an inquiry; but it is whether, acting as an ordinarily prudent person would have done, she was called upon, under the circumstances, to make inquiry. Were the circumstances such as to necessitate the making of some inquiry, at the peril of being charged with the knowledge of some then unperceived fact?
(Anderson v Blood, 152 NY 285, 295 [1897]).
This Court cannot charge petitioner with the unperceived fact of a purported lease when it was never suggested by the evidence and the facts then-known to petitioner, or to any potential purchaser for that matter. If there are no such fact(s) charged against petitioner, then the Court finds that petitioner remains a bona fide purchaser entitled to protection under the recording statute. Consequently, respondents have no right to remain in possession (see Byer v Hippolite, 2003 NY Slip Op 50611[U] [Dist Ct, Nassau County Mar. 10, 2003] ["petitioner was not put on notice of the existence of the five year lease" and therefore "the recording of the deed by the petitioner cut off all rights of the respondents to claim possession of the property"]).
C. Remaining Issues
The Court acknowledges that whether Kenneth had authority to issue a lease to himself instead of, e.g., a managing agent, and/or whether the lease is a sham, and was backdated and manufactured for this holdover proceeding, were remaining legal and credibility questions that were presented at trial (see, e.g., Mak v Wing Kin Constr., Inc., 5 Misc 3d 137[A], 2004 NY Slip Op 51576[U] [App Term, 1st Dept 2004] [noting that whether the sweetheart lease was a sham was a credibility issue to be determined at trial]). However, the Court finds that it need not reach those remaining issues based on the foregoing conclusion that, assuming the lease was valid, petitioner is a bona fide purchaser without knowledge of respondents' unrecorded interest and therefore the lease is not enforceable against it.
The Court also notes that petitioner's trial memorandum sought sanctions against respondents pursuant to 22 NYCRR 130.1-1 for frivolous conduct. However, respondent was unable to respond to the request because the parties' post-trial briefs were submitted simultaneously to the Court. Accordingly, that request is denied without prejudice.
Finally, the parties agreed to address petitioner's request for use and occupancy after this trial decision was issued, and the Court permits the parties such opportunity as set forth below.
III. Conclusion
The Court's VERDICT is in favor of petitioner and petitioner is awarded a judgment of possession of the premises.
Accordingly, it is hereby ORDERED that the Clerk is directed to enter a final judgment granting the holdover petition and awarding possession of the premises — i.e., the northerly store on the ground floor of the property located at 25 Thompson Street in Manhattan — to petitioner Jane 8 LLC against all respondents; and it is further
ORDERED that a warrant of eviction shall be issued forthwith, without stay. The earliest execution date of the warrant is October 20, 2025; and it is further
ORDERED that the request for a money judgment, including use and occupancy, is severed and may be sought in plenary action or raised by motion in this Court within 90 days from entry of this order.
This constitutes the decision, verdict, and order of the Court.
DATED: October 10, 2025
Brooklyn, New York
ENTER:
RENA MALIK
Judge of the Civil Court

Footnotes

Footnote 1:May 30, 2024 (trial transcript herein after referred to as tr 1); July 1, 2024 (trial transcript herein after referred to as tr 2); July 29, 2024 (trial transcript herein after referred to as tr 3); August 2, 2024 (trial transcript herein after referred to as tr 4); August 6, 2024 (trial transcript herein after referred to as tr 5); August 19, 2024 (trial transcript herein after referred to as tr 6); September 24, 2024 and September 30, 2024 (trial transcript herein after referred to as tr 7); October 28, 2024 (trial transcript herein after referred to as tr 8); October 29, 2024 (trial transcript herein after referred to as tr 9); December 12, 2024 (trial transcript herein after referred to as tr 7 [combined with prior proceedings]); and January 10, 2025 (trial transcript herein after referred to as tr 10).

Footnote 2:Augspach bid on the other two, but Kenneth successfully outbid Augspach on them (tr 1 at 19:7-9).

Footnote 3:The estate moved to direct Kenneth to surrender the premises, or alternatively direct him to enter into a market-rate lease, or alternatively award the defendant-estate compensation in the reduced value of the rent-free occupancy at the time of auction (exhibit E).

The motion concerned, not only Kenneth's rent-free occupancy, but also other members of the family and their respective rent-free occupancies of various properties. There is not one piece of evidence suggesting that anyone had a lease. Except, notably, in Kenneth's affidavit in opposition, he states that he solely owns a property on 11th Street, which has been occupied by his nephew at a nominal amount of less than $600 per month. Even though Kenneth became the sole owner, Kenneth averred that his nephew Craig "refuses to vacate the apartment he occupies in that building. While Craig claims that he has a lease, no such lease has been produced to me or my counsel despite repeated requests" (exhibit 5 at ¶ 10—11). The Court finds this revealing as it demonstrates that Kenneth is aware of the difference between "rent-free occupancy" (or occupancy with "nominal rent") and being a party to a lease for a term of years. And when Craig the tenant claimed he had a lease, Kenneth the landlord had then asked for it — not the other way around. Here, Kenneth's affidavit in opposition specifically references his occupancy, glaringly omitting any reference to a lease (exhibit 5 at ¶ 7).

Thus, even assuming the Court were to find that petitioner had a duty to review the 700+ filings in the partition action (which it does not), the facts contained within such papers still did not give notice of a fact that Kenneth had a lease or suggest that an inquiry be made to ask for the same.